IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JOSE FERNANDO MORAN OCEGUEDA, ) <br> ) <br> Movant, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> Respondent. ) | CASE NO. 3:09-0132 <br> JUDGE HAYNES |

## MEMORANDUM

Movant, Jose Fernando Moran Ocegueda, filed this action under 28 U.S.C. § 2255 seeking to set aside his convictions for conspiracy to possess with the intent to distribute five (5) or more kilograms of cocaine and possession with the intent to distribute five (5) kilograms or more of cocaine for which Movant received a sentence of 240 months. After a review of the motion, the Court directed the United States to file a response. The United States filed a response and the affidavit of Movant's trial counsel in his criminal action. (Docket Entry Nos. 7 and 8).

Movant's claims are, in essence: that his trial counsel provided ineffective assistance of counsel for her failures to object to a co-defendant's closing argument, to conduct a complete investigation for Movant's defense, to provide effective arguments against enhancements of his sentence at trial and on appeal, and to provide a legal and factual defense at sentencing.

### A. Procedural History

The fourth superseding indictment charges Movant and others with conspiracy

1

to possess with the intent to distribute five (5) kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846 and 18 U.S.C. § 2 and possession with intent to distribute five (5) kilograms of cocaine from in or about June 2002 through on or about August 14, 2002. Prior to trial, Movant's counsel filed a motion to suppress that the District Court denied. After a jury trial, Movant was convicted on both counts. After a sentencing hearing, the Movant received a sentence of 240 months based upon his leadership role in the conspiracy and possession of cocaine with the intent to distribute. Movant filed a direct appeal and after review, the Sixth Circuit affirmed his convictions and sentence. United States v. Moore, 240 Fed. Appx. 699 (6th Cir. 2007).

### B. Review of the Record

The facts underlying the Movant's convictions were summarized by the Sixth Circuit on Movant's direct appeal as follows:

> The evidence presented to the jury showed the following. Javier Zamora ran a marijuana and cocaine distribution network centered in Chicago. **Zamora employed Phillip Pena-Santiago to transport the drugs from sources in downtown Chicago to Zamora's residence, which he used as a storage facility. And he employed Efren Lopez-Benitez to courier drugs from Zamora's residence to buyers in Michigan, including Jose Fernando Moran Ocegueda.**
>
> **In April 2002, Zamora gave Lopez-Benitez eight to ten pounds of marijuana and told him to contact Ocegueda because "he could move it." JA 1350-51. Lopez-Benitez contacted Ocegueda and sold him the marijuana. Lopez-Benitez arranged another sale of drugs—this time half a kilogram of cocaine—to Ocegueda from Zamora a while later.**
>
> **In the early summer of 2002, Ocegueda approached Lopez-Benitez about buying five to seven kilograms of cocaine, which he planned to cut and sell for $26,000 a kilogram. They met at Zamora's house, and Zamora agreed to provide Ocegueda with the cocaine but Ocegueda "would have to wait." JA 1359. While discussing the delivery of the cocaine with Lopez-Benitez and**

2

**Guillermo Alvarez-Garcia (another colleague) at a restaurant in Kalamazoo, Michigan, Ocegueda offered the use of a 1998 Plymouth Breeze. The Plymouth Breeze was useful for transporting drugs, Ocegueda explained, because it had a hidden compartment where the passenger-side airbag used to be.**

**In July, Zamora arranged to buy the cocaine from a supplier in Memphis, Tennessee. After Lopez-Benitez refused to retrieve Ocegueda's cocaine from Memphis, Zamora contacted Pena-Santiago, and he agreed to make the trip. On July 9, Lopez-Benitez picked up the Plymouth Breeze from Ocegueda, met with Pena-Santiago and taught him how to open the car's hidden compartment. Lopez-Benitez also gave Pena-Santiago a hand-drawn map showing him where to go in Memphis and the phone number of Paulino Guizar—Zamora's brother-in-law and Pena-Santiago's contact in Memphis.** That night, after arriving in Memphis, Pena-Santiago called Guizar, arranged to meet him and rented a hotel room.

The two met the next day and scheduled a meeting with "the person holding the cocaine"—Ferlandis Herod. JA 770. Herod, who drove a red pick-up truck (a "red Ford Ranger truck," JA 1786), met the two at a gas station and directed them to follow him to a nearby cemetery. There, the three transferred the cocaine from the bed of Herod's pick-up to the trunk of the Plymouth Breeze, and Herod left.

All of this made Guizar upset because they now had "[t]oo many kilos of cocaine." JA 774. He made a series of phone calls, which prompted another meeting with Herod, this time outside Pena-Santiago's hotel. Herod offered to "take [back] as many [kilograms] as [they] were going to give him," JA 775, but left empty-handed because Guizar could not decide how much to return. Later that night, Guizar and Pena-Santiago met with Herod again at a gas station and followed him to his residence on Cleopatra Drive. They parked the Plymouth Breeze in Herod's garage, unloaded a portion of the cocaine and went into Herod's house for "a couple of minutes" to talk. JA 778–79. Escorted by Herod on a blue Yamaha motorcycle, Pena-Santiago and Guizar returned to the hotel for the night.

The next day, July 11, Pena-Santiago and Guizar met two of Guizar's colleagues and purchased a vacuum-sealing, food-storage system from Sam's Club. After several phone calls, they met with Terrance Moore, who led them to a house on West Holmes Avenue. Eric Griffin, one of Moore's friends, owned the house and had agreed to let Moore use it to unload and store "some dope." JA 791, 1159. That night, Pena-Santiago and Guizar retrieved the cocaine they had left at Herod's house and put it in Griffin's garage. As payment for the use of Griffin's garage, Moore and Griffin received two to three kilograms of cocaine. At the

3

same time, Moore gave a pistol to one of Guizar's colleagues, who handed it to Guizar, who handed it to Pena-Santiago, who in turn left the gun in the garage.

When everyone but Guizar and Pena-Santiago had left the garage, these two inventoried the remaining cocaine and determined that there was between 70 and 80 kilograms. Guizar and Pena-Santiago repackaged the cocaine using the vacuum-sealing system from Sam's Club, placed 12 to 15 kilograms in the gas tank of Guizar's truck and 7 kilograms in the hidden compartment of the Plymouth Breeze. At that point, Guizar told Pena-Santiago to deliver the seven kilograms in the Plymouth Breeze to Nashville before restocking and returning to Chicago. Pena-Santiago also spoke with Zamora, who promised him "a truck plus a bunch of money" for completing the additional delivery. JA 811.

The next morning, July 12, Pena-Santiago left for Nashville in the Plymouth Breeze. About 50 miles outside of Nashville, an officer stopped Pena-Santiago for speeding and Pena-Santiago consented to a search of the car. During the search, Pena-Santiago called Zamora and told him that he had been pulled over for speeding but that the cocaine remained safely hidden. When the police discovered the cocaine hidden in the Breeze's compartment, they arrested Pena-Santiago, and soon after he agreed to cooperate.

At the urging of the police, Pena-Santiago placed several recorded telephone calls to Zamora, Lopez-Benitez and Guizar. Pena-Santiago told them he had been stopped for speeding and received a speeding ticket. He said the police had not found the hidden compartment (and the cocaine) but that they had impounded the Plymouth Breeze after finding marijuana in the trunk. Pena-Santiago also told Zamora that the police would release the vehicle only to its registered owner and that he needed money for a hotel room.

Zamora contacted Lopez-Benitez and told him to go to Nashville to pick up the Plymouth Breeze from the impound lot. **Ocegueda also ordered Alvarez-Garcia and another person to go with Lopez-Benitez and called to check on their progress during the drive. Upon their arrival in Nashville, they went to Pena-Santiago's hotel to pick him up, but they were arrested** instead.

Meanwhile, Moore called Griffin and told him to pick up Guizar, who was still staying at Griffin's house on West Holmes Avenue, and bring him to Moore's residence in Mississippi. Because Griffin "didn't know if police were coming or not," he did not have much time to check and see if all the drugs had been removed from his garage, but when Moore asked if Griffin and Guizar "[got] everything out of the house," Griffin said they had. JA 1174. That evening the police searched Griffin's property and found empty kilogram wrappers in the trash

can, a hotel receipt for "Phillip Pena," JA 1305, an instructional video for using a
vacuum-sealing system and an old bill addressed to "Terrance Moore," JA 1313.

Id. at 702-04 (emphasis added).

## B. Conclusions of Law

For relief in a Section 2255 action, the Movant must set forth facts that entitle him to relief as conclusory allegations are not sufficient to warrant a hearing. O'Malley v. United States, 285 F.2d 733, 735 (6th Cir. 1961). Pro se movants must allege at least "some minimum level of factual support". White v. White, 886 F.2d 721, 724 (4th Cir. 1989). If the judge in the section 2255 action is the trial judge, the "judge may rely on his recollections" of the prior proceedings in ruling on the merits of claims. Blanton v. United States, 94 F.3d 227, 235 (6th Cir. 1996).

An evidentiary hearing is not required in a Section 2255 action where the motion, trial record and the direct appeal conclusively show that the movant is not entitled to relief in the Section 2255 action. Arredondo v. United States, 178 F.3d 778, 782 (6th Cir. 1999). Based upon the record of Movant's criminal action and his direct appeal, the Court concludes that an evidentiary hearing is unnecessary to decide Movant's claims.

To establish ineffective assistance of counsel, Petitioner must demonstrate that under the totality of the circumstances, his trial counsel performed deficiently and that counsel's performance resulted in prejudice. Strickland v. Washington, 466 U.S. 668, 695 (1984). As the Supreme Court has explained:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

5

Id. at 687.

As to the "performance" inquiry, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688. Under Strickland, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Id. at 691.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decision, just as it may be critical to a proper assessment of counsel's other litigation decisions.

Id. at 691.

In any event, Strickland directs that "[j]udicial scrutiny of counsel's performance must be **highly** deferential" and "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 689, 691 (emphasis added). A strong presumption "arises" that "counsel's conduct falls within the wide range of reasonable professional assistance," id. at 689, particularly on tactical or strategic decisions. Id. at 689, 690. Trial

counsel's failures must be "'outside the wide range of professionally competent assistance.'" Smith v. United States, 348 F.3d 545, 551 (6th Cir. 2003) (quoting Strickland, 466 U.S. at 690).

As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Strickland, 466 U.S. at 691 (emphasis added). Whether an attorney's performance was reasonably effective requires consideration of the totality of the circumstances of the trial. Id. at 688.

To establish prejudice due to his counsel's errors or omissions, Movant must establish "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Williams v. Taylor, 529 U.S. 362, 391 (2000). In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694. Movant's burden is to "show a reasonable probability that, but for his attorney's errors, the proceedings would have produced a different result." Ross v. United States, 339 F.3d 483, 492 (6th Cir. 2003). In this showing, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) (quoting Strickland, 466 U.S. at 690).

Movant's first ineffective assistance of counsel claim is that during closing argument

counsel's failures must be "'outside the wide range of professionally competent assistance.'" Smith v. United States, 348 F.3d 545, 551 (6th Cir. 2003) (quoting Strickland, 466 U.S. at 690).

As the Supreme Court noted, "[c]ounsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information." Strickland, 466 U.S. at 691 (emphasis added). Whether an attorney's performance was reasonably effective requires consideration of the totality of the circumstances of the trial. Id. at 688.

To establish prejudice due to his counsel's errors or omissions, Movant must establish "a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Williams v. Taylor, 529 U.S. 362, 391 (2000). In a word, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Strickland, 466 U.S. at 694. Movant's burden is to "show a reasonable probability that, but for his attorney's errors, the proceedings would have produced a different result." Ross v. United States, 339 F.3d 483, 492 (6th Cir. 2003). In this showing, "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance." Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) (quoting Strickland, 466 U.S. at 690).

Movant's first ineffective assistance of counsel claim is that during closing argument

co-defendant Moore's counsel stated: "I believe that you will come to a guilty verdict for some people, but I think that you will come to an innocent verdict for Terrance Moore." Moore, 240 Fed. Appx. at 711. Movant asserts that his trial counsel failed to object to this statement. Yet, on direct appeal, the Sixth Circuit considered this statement and found that "[g]iven the extensive evidence against Ocegueda—including the testimony of Pena-Santiago, Lopez-Garcia, and Alvarez-Garcia—there is little likelihood that counsel's statement affected the jury's deliberations." Id. The Sixth Circuit also ruled that this statement, when considered with other alleged errors, was harmless error. Id. Given the Sixth Circuit's ruling on direct appeal, the Court concludes that Movant cannot establish the requisite prejudice under Strickland for this claim. Claims decided on direct appeal cannot be grounds for relief under 28 U.S.C. § 2255. Dupont v. United States, 76 F.3d 108, 110-111 (6th Cir. 1996).

Movant's next claim is that his trial counsel and appellate were ineffective in arguing against enhancement of Movant's guideline calculation based upon his leadership role in the conspiracy. Trial counsel raised this issue in the district court and again on appeal. The Sixth Circuit found that the Court's decision to increase the offense level for Movant's leadership role was supported by the record. Moore, 240 Fed. Appx. at 712. With the Sixth Circuit's findings, the Court concludes that Movant cannot show prejudice by his counsel's performance on this claim.

Movant's next claim that if he had been "fully advised" about a guilty plea, he would have pled guilty or proceeded to a bench trial on stipulated facts. Movant has a category III criminal history. (United States v. Zamora, et. al., Case No. 3:02cr128, Docket Entry No. 524 at 1). Prior to trial, several defendants had entered guilty pleas. Katherine Morris, an exceptional

defense counsel, states that she fully explained the various potential outcomes based upon a guilty plea or trial and Movant adamantly refused to discuss a guilty plea with Morris. (Docket Entry No. 8, Morris Affidavit at 2). Given Movant's criminal history, the co-defendants who pled guilty prior to trial and Morris's statement, the Court concludes Movant was aware of the guilty plea option. This claim lacks merit.

Movant's next claim is his counsel's failure to challenge inmate searches of his property and failure to object because the court did not ask if Movant had read the presentence report. First, the record does not reflect any introduction into evidence of Movant's personal items in jail. Morris read the presentence report to Movant. Id. at 3. Movant again fails to prove any prejudice because of these alleged failures.

Movant next cites his counsel's failure to request appropriate jury instructions, to object to the prosecutor's argument, to object to evidence to determine Movant's sentencing guidelines, to move for a downward departure, to present the strongest issues on appeal, and to preserve issues for collateral review. Movant also alleges that Morris had a conflict of interest. Movant fails to cite any facts to support these claims that are conclusory allegations without merit.

For these reasons, the Court concludes that this action should be dismissed.

An appropriate Order is filed herewith.

Entered this the 2nd day of November, 2011.

William J. Haynes, Jr.
United States District Judge